David H. Shoup, Esq.
TINDALL BENNETT & SHOUP, P.C.
508 W 2nd Avenue, Third Floor
Anchorage, Alaska 99501
(907) 278-8533 Fax: (907) 278-8536
Shoup@tindall-law.com
Attorneys for Plaintiffs

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| WILLIAM CURTIS, M.D. and PEDRO VALDES, M.D. </br></br>    Plaintiffs,</br></br>-vs-</br></br>PROVIDENCE HEALTH & SERVICES, PROVIDENCE HEALTH & SERVICES – WASHINGTON, and BRUCE LAMOUREUX,</br></br>    Defendants. | Case No. 3AN-18-09069 CI |

## AMENDED COMPLAINT

COMES NOW William Curtis, M.D., and Pedro Valdes, M.D., and for their Amended Complaint state and allege:

1. Plaintiff William Curtis, M.D., is a resident of Anchorage, Alaska.

2. Plaintiff Pedro Valdes, M.D., is a resident of Anchorage, Alaska.

3. Defendant Providence Health & Services ("Providence") is a Washington non-profit corporation whose principal place of business is Anchorage, Alaska.

4. Defendant Providence Health & Services – Washington ("Providence-

1

Washington") is a Washington non-profit corporation whose principal place of business is Anchorage, Alaska.

5. Defendant Bruce Lamoureux is the Alaska Regional Chief Executive of Providence–Washington. Defendant Lamoureux is a citizen of Alaska, residing in Anchorage. At all times relevant, defendant Lamoureux was chief executive of PAMC and the Alaska Region Chief Executive of Providence–Washington.

6. This Court has jurisdiction of this matter pursuant to AS 22.10.020.

### Facts Pertinent to All Causes of Action

**A.  The Hospital Market.**

7. Providence Alaska Medical Center ("PAMC") is the largest acute care hospital in Anchorage. PAMC is owned and operated by Providence – Washington. Providence is Providence–Washington's principal or sole "member." Although there are several ambulatory surgery centers in Anchorage, Alaska Regional Hospital (ARH) is PAMC's only hospital competitor within the Municipality of Anchorage.

8. PAMC's revenues, patient head count and capacity make it the largest hospital in the Anchorage market.

9. PAMC's revenues as of April 2018 were more than twice those of ARH ($2,127,745,252 for PAMC, $947,754,317 for ARH), a different of about 55 percent.

10. PAMC has 379 staffed beds while AHR has 174, a difference of about 45 percent.

11. PAMC's patient headcount annually is more than twice that of ARH.

12. While PAMC and ARH receive patients from outlying communities as well

as from Anchorage, PAMC has at least two-thirds of the Anchorage hospital market when measured by annual revenue, staffed beds and patient headcount.

B. **PAMC's rules and bylaws.**

13. Dr. Valdes was granted medical staff privileges at PAMC in 1995.

14. Dr. Curtis was granted medical staff privileges at PAMC in 2008.

15. At the time Drs. Valdes and Curtis became a part of the PAMC medical staff, PAMC had no provision in its bylaws by which a physician could lose medical staff privileges due to a decision by PAMC that had nothing to do with the physician's conduct.

16. Since they began performing cardiac and thoracic surgery at PAMC, both Dr. Valdes and Dr. Curtis have been ranked in the top tier of cardiothoracic surgeons nationally.

17. Since they were granted medical staff privileges, PAMC has not disciplined Dr. Valdes or Dr. Curtis in any way.

18. On Oct. 17, 2017, PAMC adopted a Medical Staff Credentials Policy, which states in part:

> From time to time, the Medical Center may enter into contracts or arrangements with practitioners and/or groups of practitioners for the performance of clinical and administrative services at the Medical Center. . . .
>
> To the extent that . . . any such contract or arrangement confers the exclusive right to perform specified services to . . . groups . . . no other practitioner except those authorized by or pursuant to the contract or arrangement may exercise clinical privileges to perform the specified services while the contract or resolution is in effect. [Medical Staff Credentials Policy, § 4.E(a)-(b).]

3

Exhibit A, Page 3 of 13

Case 3:18-cv-00281-HRH   Document 1-1   Filed 12/06/18   Page 3 of 13

19. Medical Staff Credentials Policy, § 4.E(a)-(b) did not exist when Drs. Valdes and Curtis were given medical staff privileges. On information and belief, the policy came into effect in October 2017.

20. Having been adopted after Dr. Valdes and Dr. Curtis obtained medical staff privileges at PAMC, credentials policy 4.E(a)-(b) does not form a part of their agreement with PAMC under which they were granted medical staff privileges.

21. Consistent with 7 AAC § 12.110 (requiring acute care hospitals to have bylaws and rules), PAMC updated its Medical Staff Bylaws in October 2017. The bylaws contain a procedure for appointment and reappointment to the PAMC medical staff. [Medical Staff Bylaws, Article 7.]

22. The bylaws have a mechanism for suspension or revocation of medical staff privileges, but the procedure focuses on medical competence, safety and patient care, violation of ethical standards, and disruptive behavior. The bylaws are silent as to limitations on, or termination of, medical staff privileges for economic or administrative decisions made by the hospital.

C. **The exclusive contract.**

23. On August 29, 2016, PAMC chief executive Dick Mandsager, M.D., issued a memo stating that PAMC had recently completed a seven-month consultation with "an outside cardiothoracic (CT) surgeon who assessed all aspects of our program at PAMC."

24. The surgeon was Anthony "Tony" Furnary of the Starr-Wood Cardiac Group of Portland, P.C (Starr-Wood).

4

25. The memo stated that for 30 days in 2016, PAMC had no CT EMTALA coverage due to "an insufficient number of surgeons in Anchorage." The memo expressed a desire to enter into an exclusive contract with a single CT group to improve PAMC's CT surgery service efficiency, as well as "CT surgeon availability, patient outcomes, and patient, staff and referring physician satisfaction."

26. Due to a small number of CT surgeons with privileges at PAMC, Drs. Valdes and Curtis approached PAMC administration with a proposal that would allow them to hire a third CT surgeon from outside Alaska if PAMC would guarantee a salary for the third surgeon, making up any shortfall in revenue between collections and $1.5 million, if such a shortfall occurred. PAMC did not respond to the proposal.

27. On May 1, 2017, PAMC sent a Letter of Intent to Starr-Wood, stating that on or before Aug. 1, 2017, the parties would use their best efforts to negotiate a final agreement for CT services, and during the term set out in the letter they would **not** entertain proposals from any third party for such services.

28. Drs. Valdes and Curtis informed PAMC by letter that if negotiations with Starr-Wood were unsuccessful, Drs. Valdes and Curtis would be able to form a group that would be able to provide CT surgery coverage for PAMC.

29. Starr-Wood sought to affiliate with Drs. Valdes and Curtis, but the arrangement proposed by Starr-Wood would have made them subordinate to Starr-Wood and given Starr-Wood the power to exclude them from PAMC at any time. Drs. Valdes and Curtis rejected Starr-Wood's proposal.

30. On May 22, 2017, PAMC chief executive Bruce Lamoureaux wrote that he

was disappointed to learn that Drs. Valdes and Curtis had not been able to reach mutually acceptable terms under which they would join with Starr-Wood. The letter stated: "[s]hould PAMC's negotiations with Starr-Wood or a Starr-Wood-affiliated entity end successfully, only surgeons affiliated with the contracting entity will have related privileges at PAMC."

31. On June 1, 2018, PAMC wrote to Drs. Curtis and Valdes that PAMC had entered into an exclusive agreement for CT services and notified them that their clinical privileges to perform cardiac and thoracic surgery services at the Hospital would automatically terminate on the "CT Start Date" unless they became employees of NorthStarr Cardiothoracic Surgery, LLC, Starr-Wood's contracting subsidiary.

32. On the same day, June 6, Starr-Wood forwarded draft employment agreements to Drs. Valdes and Curtis. While the agreements contained a three-year term, NorthStarr Cardiothoracic Surgery, LLC, would have the right to terminate the employment agreements at any time "for any reason or no reason . . . ." Drs. Valdes and Curtis chose not to become NorthStarr employees on such terms.

33. PAMC informed surgeons with cardiac and thoracic surgery privileges that such privileges will terminate as of Sept. 4, 2018.

34. The exclusive contract, entitled Professional and Program Management Services Agreement, provides that Starr-Wood and its wholly owned subsidiary, NorthStarr Cardiothoracic Surgery, LLC, would have the exclusive right to perform cardiac and thoracic surgery at PAMC for five years.

35. The exclusive contract provides for an annual collections guarantee by

PAMC of $2,849,000 for each Starr-Wood physician and $554,000 for each Starr-Wood nurse practitioner and physician's assistant.

36. The exclusive contract also provides for up to $2,000,000 to be paid annually by PAMC to Starr-Wood or its contracting subsidiary for management services, and additional funds to be paid for call coverage.

**D.  PAMC's previous contract with Starr-Wood.**

37. The exclusive contact is the second time PAMC has entered into an agreement with Starr-Wood for cardiac and thoracic surgery.

38. In the 1990's, PAMC had a similar contract with Starr-Wood, and as a result patient care suffered and the contract was not extended.

39. Under the earlier agreement, Starr-Wood employed some surgeons who had poor clinical outcomes and the arrangement drew complaints from patients and the Anchorage medical community.

40. Under the earlier agreement, Starr-Wood received revenue from PAMC for surgical services, but it kept for itself substantial amounts of those revenues and did not pay the surgeons the amounts paid by PAMC for the surgeon's services.

41. More recently, Starr-Wood entered into a contract with a hospital in Bend, Oregon. That contract was not renewed after the Bend hospital received numerous complaints about Starr-Wood.

**E.  The impact on patient care.**

42. Under the Starr-Wood exclusive contract with PAMC, Starr-Wood has assigned surgeons to work at PAMC who do not live in Alaska. The plan is to have one

surgeon in Anchorage at a time, and to rotate them in and out so that they will be able to live primarily outside of Alaska.

43. As a result, the Starr-Wood surgeons will be "itinerant surgeons" who will not be available to follow their surgical patients when the surgeons are out of town, and instead will pass them off to the next Starr-Wood surgeon. This practice will have an adverse affect on the quality of patient care.

44. Due to the nature of the exclusive contract, if the Starr-Wood surgeon in Anchorage at the time becomes involved in a complicated, time-consuming case, there will be no other surgeon with privileges to cover concurrent emergencies. This also will have an adverse impact on patient care.

45. Some of the surgeons Starr-Wood plans to assign to PAMC are relatively inexperienced and/or do not perform sufficient numbers of surgeries, either cardiac, thoracic, or both, to be able to treat PAMC's patients with the same degree of skill and expertise regularly employed by Dr. Valdes and Dr. Curtis. As a result, patient care will suffer.

46. For the past five years Dr. Valdes has been ranked as the number one surgeon for coronary bypass procedures in the entire Providence system, which includes hospitals in Washington, Oregon, California and Montana, as well as Alaska. None of the Starr-Wood surgeons who will be assigned to work in Anchorage has matched this level of proficiency either in coronary bypass or in other areas of cardiothoracic surgery.

47. Dr. Curtis has been ranked hear the top of all cardiothoracic surgeons in the Providence system for complications and patient outcomes. None of the Starr-Wood

8

Exhibit A, Page 8 of 13

Case 3:18-cv-00281-HRH   Document 1-1   Filed 12/06/18   Page 8 of 13

surgeons who will be assigned to work in Anchorage has matched his level of proficiency.

48. The rates of mortality, infection, perioperative stroke and other complications related to surgery for Dr. Curtis and Dr. Valdes are measurably better than those of the cardiothoracic surgery programs at other Providence hospitals of a similar size.

49. There has been and will continue to be a significant impact on patient care as a result of the exclusive contract. Unfortunately, this impact will be negative.

50. The decline in the qualify of patient care brought about by the exclusive contract also will be needless. PAMC could have solved its inability to provide call coverage by agreeing to an income guarantee for one surgeon that would have been a fraction of the cost of the income guarantee per surgeon contained in the exclusive agreement with Starr-Wood.

51. There also has been economic harm to Drs. Valdes and Curtis, who after many years at PAMC have lost their ability to perform surgery there.

52. However, the more urgent harm will be to PAMC's patients, who overall will be exposed to surgeons who are less capable than Drs. Valdes and Curtis of performing heart and thoracic surgery.

**First Cause of Action**
(Violation of Antitrust Laws)

53. Paragraphs 1-52 are incorporated by reference.

54. Alaska Stature 45.50.562 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is unlawful."

55. Under AS 45.50.562 et seq. exclusive contracts most pass a "rule of reason"

test to be lawful. Under AS 45.50.564, attempt to monopolize also is unlawful. Providence has breached both statutes.

56. If found in violation of Alaska's antitrust laws, the defendant becomes liable for treble damages and reasonable attorney fees, and is subject to injunctive relief. AS 45.50.576(a)(1)-(2).

57. The exclusive contract with Starr-Wood does not pass the rule of reason test and therefore is unlawful.

58. Plaintiffs are entitled to an injunction reinstating the plaintiff's medical staff privileges, to treble damages and to reasonable attorney fees and costs.

**Second Cause of Action**
(Breach of Contract)

59. Paragraphs 1-58 are incorporated by reference.

60. PAMC's extension of medical staff privileges to Drs. Valdes and Curtis, and their acceptance of them, formed a contract between Dr. Valdes and PAMC, and between Dr. Curtis and PAMC.

61. PAMC breached these contracts by rescinding their medical staff privileges without cause and by excluding them from the hospital facilities where they may perform cardiac and thoracic surgery.

62. In so doing, PAMC breached its own bylaws.

63. As a direct and proximate result, Drs. Valdes and Curtis are entitled to specific performance, requiring that their privileges be reinstated, and for damages flowing from the breach.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

### Third Cause of Action
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

64. Paragraphs 1-63 are incorporated by reference.

65. A covenant, or promise, of good faith and fair dealing is implied as a matter of law in all contracts in Alaska.

66. Through its exclusion of Drs. Curtis and Valdes from PAMC, PAMC breached the implied covenant of good faith and fair dealing.

67. As a direct and proximate result, Drs. Valdes and Curtis are entitled to specific performance, requiring that their privileges be restored, and for damages flowing from the breach.

### Fourth Cause of Action
(Breach of AS 45..50.471 et seq.)

68. Paragraphs 1-67 are incorporated by reference.

69. The Alaska Unfair Trade Practices Act, AS 45.50.471 et seq., makes it unlawful to engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

70. PAMC violated the statute by, among other things stating the exclusive contract was needed to promote patient care, when in fact it was not necessary for patient care and will cause the level of patient care to decline. AS 45.50.471(b)(12).

71. PAMC also violated the statute by engaging in an unfair method of competition, using its dominant position in the Anchorage hospital market to promote some cardiothoracic surgeons over others on a false claim of necessity. AS 45.50.471(b)(14).

72. As a direct and proximate result, Drs. Valdes and Curtis are entitled to injunctive relief reinstating their privileges and to an award of treble damages and reasonable attorney fees. AS 45.50.531(a), 45.50.537(a).

**Fifth Cause of Action**
(Intentional Interference)

73. Paragraphs 1-72 are incorporated by reference.

74. By entering into the exclusive contract with Starr-Wood and excluding Drs. Valdes and Curtis, Providence–Washington and Bruce Lamoureux intentionally interfered with prospective economic advantage by wrongfully eliminating their ability to continue treating patients at PAMC.

75. As a direct and proximate result, Providence–Washington and Bruce Lamoureux are liable for damages relating to this loss in an amount in excess of $100,000, the exact amount to be proved at trial.

**Sixth Cause of Action**
(Piercing Corporate Veil)

76. Paragraphs 1-75 are incorporated by reference.

77. Providence–Washington is a mere instrument of Providence.

78. By executing the exclusive contract, Providence acted through Providence–Washington to defeat public convenience and justify wrong.

77. As a direct and proximate result, Providence should be held liable for the conduct of Providence–Washington.

WHEREFORE plaintiffs pray:

1. For injunctive relief, requiring reinstatement of the plaintiffs' medical staff

12

privileges at PAMC.

2. For treble damages and common law damages in an amount in excess of $100,000, the exact amount to be proved at trial.

3. For reasonable attorneys fees and costs, and for fees and costs pursuant to Alaska civil rules.

4. For such further relief as the Court deems just and proper.

DATED at Anchorage, Alaska this 9th day of November, 2018.

TINDALL BENNETT & SHOUP, P.C.
Attorneys for Plaintiffs

By: _____
David H. Shoup
Alaska Bar No. 8711106

I hereby certify that on the 9th day of Nov., 2018, a true and correct copy of the foregoing was sent to the following via:

☐ Mail  ☒ Hand Delivered  ☐ Fax  ☐ Email

Jon S. Dawson, Esq.
Davis Wright Tremaine LLP
118 W. Northern Lights Blvd., Ste. 1100
Anchorage, Alaska 99503

By: _____
Tindall Bennett & Shoup, P.C.