WO          IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

WILLIAM CURTIS, M.D., and PEDRO )
VALDES, M.D., )
 )
                                Plaintiffs, )
 )
   vs. )
 )
PROVIDENCE HEALTH & SERVICES, )
PROVIDENCE HEALTH & SERVICES- )
WASHINGTON, and BRUCE LAMOUREUX, )
 )   No. 3:18-cv-0281-HRH
                              Defendants. )
_____)

O R D E R

Motion to Remand

Plaintiffs move to remand this matter to state court.[1] This motion is opposed.[2] Oral argument was not requested and is not deemed necessary.

Background

Plaintiffs are William Curtis, M.D., and Pedro Valdes, M.D., both of whom are alleged to be citizens of Alaska.[3] Defendants are Providence Health & Services (PH&S),

---

[1] Docket No. 13.

[2] Docket No. 14.

[3] Amended Complaint at 1, ¶¶ 1-2, Exhibit A, Notice of Removal, Docket No. 1.

Providence Health & Services - Washington (PH&S-Washington), and Bruce Lamoureux. PH&S is alleged to be "a Washington non-profit corporation whose principal place of business is Anchorage, Alaska."[4] PH&S-Washington is alleged to be "a Washington non-profit corporation whose principal place of business is Anchorage, Alaska."[5] Lamoureux is alleged to be "the Alaska Regional Chief Executive of" PH&S-Washington and "a citizen of Alaska[.]"[6]

Plaintiffs are cardiothoracic surgeons who had medical staff privileges at Providence Alaska Medical Center (PAMC).[7] Plaintiffs allege that PAMC is owned and operated by PH&S-Washington and that PH&S is PH&S-Washington's "principal or sole 'member.'"[8]

Plaintiffs allege that in August 2016, PAMC completed a review of its cardiothoracic program, which revealed some coverage issues due to the small number of cardiothoracic surgeons with privileges at PAMC.[9] In response, plaintiffs proposed hiring a third cardiothoracic surgeon "if PAMC would guarantee a salary for the third surgeon, making up

---

[4] Id. at ¶ 3.

[5] Id. at 2, ¶ 4.

[6] Id. at ¶ 5.

[7] Id. at 3, ¶¶ 13-14, 16.

[8] Id. at 2, ¶ 7. "PH&S is a holding company. . . ." Declaration of John D. Whipple [etc.] at 2, ¶ 3, Exhibit C at 2, Notice of Removal, Docket No. 1.

[9] Amended Complaint at 4-5, ¶¶ 24-25, Exhibit A, Notice of Removal, Docket No. 1.

any shortfall in revenue between collections and $1.5 million, if such a shortfall occurred."[10]

Plaintiffs allege that "PAMC did not respond to [their] proposal."[11]

Instead, plaintiffs allege that PAMC was pursuing an exclusive contract with Starr-Wood Cardiac Group of Portland, P.C.[12] Plaintiffs allege that "Starr-Wood sought to affiliate with [them], but the arrangement proposed by Starr-Wood would have made them subordinate to Starr-Wood and given Starr-Wood the power to exclude them from PAMC at any time."[13] Plaintiffs allege that they "rejected Starr-Wood's proposal."[14]

Plaintiffs allege that on May 22, 2017,

> Lamoureux wrote that he was disappointed to learn that [they] had not been able to reach mutually acceptable terms under which they would join with Starr-Wood. The letter stated: "[s]hould PAMC's negotiations with Starr-Wood or a Starr-Wood-affiliated entity end successfully, only surgeons affiliated with the contracting entity will have related privileges at PAMC."[15]

Plaintiffs allege that

> [o]n June 1, 2018, PAMC wrote to [them] that PAMC had entered into an exclusive agreement for CT services and notified

---

[10] Id. at 5, ¶ 25.

[11] Id.

[12] Id. at ¶ 27.

[13] Id. at ¶ 29.

[14] Id.

[15] Id. at 5-6, ¶ 30.

> them that their clinical privileges to perform cardiac and thoracic surgery services at [PAMC] would automatically terminate on the 'CT Start Date' unless they became employees of NorthStar Cardiothoracic Surgery, LLC, Starr-Wood's contracting subsidiary.[16]

Plaintiffs allege that PAMC later informed them that their privileges would terminate on September 4, 2018.[17]

Plaintiffs commenced this action on September 4, 2018. In their original complaint, plaintiffs only asserted claims against PH&S. On October 4, 2018, PH&S-Washington removed the matter to this court.[18] Plaintiffs moved to remand, and on November 8, 2017, this court granted plaintiffs' motion to remand because the case had been improperly removed by a non-party.[19] Upon remand, plaintiffs filed an amended complaint. In their amended complaint, they assert an antitrust claim against PH&S, a breach of contract claim that appears to be asserted against PH&S-Washington, a breach of implied covenant of good faith and fair dealing claim against PH&S-Washington, a breach of the Alaska Unfair Trade Practices Act claim against PH&S-Washington, an intentional interference with prospective economic advantage claim against PH&S-Washington and Lamoureux, and a piercing the corporate veil claim.

---

[16]Id. at 6, ¶ 31.

[17]Id. at ¶ 33.

[18]Exhibit B at 18, Notice of Removal, Docket No. 1.

[19]Order re Motion to Remand at 6, Docket No. 16, Case No. 3:18-cv-0233-HRH.

On December 6, 2018, PH&S-Washington again removed the action to this court on the basis of diversity jurisdiction. PH&S and Lamoureux consent to and join in the removal.[20]

Pursuant to 28 U.S.C. § 1447(c), plaintiffs now move to remand this matter to state court on the grounds that diversity jurisdiction does not exist because Lamoureux and PH&S-Washington are both citizens of Alaska.[21]

## Discussion

Section 1447(c) provides, in relevant part, that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." "A federal court has [diversity] jurisdiction over the underlying dispute if the suit is between citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs. . . ." Geographic Expeditions, Inc. v. Estate of Lhotka ex rel. Lhotka, 599 F.3d 1102, 1106 (9th Cir. 2010). Here, there is no dispute that the amount in controversy has been met. The dispute here is whether "the suit is between citizens of different states[.]" Id.

"[I]n a case that has been removed from state court to federal court under 28 U.S.C. § 1441 on the basis of diversity jurisdiction," such as this one, "the proponent of federal jurisdiction—typically the defendant in the substantive dispute—has the burden to prove, by a preponderance of the evidence, that removal is proper." Id. at 1106-07. "The preponder-

---

[20]Docket Nos. 5 and 6.

[21]Although plaintiffs have alleged that PH&S's principal place of business is in Alaska, plaintiffs do not argue in the instant motion that PH&S is a citizen of Alaska.

ance of the evidence standard applies because removal jurisdiction ousts state-court jurisdiction and 'must be rejected if there is any doubt as to the right of removal in the first instance.'" Id. at 1107 (quoting Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir.1992)). "This gives rise to a 'strong presumption against removal jurisdiction [which] means that the defendant always has the burden of establishing that removal is proper.'" Id. (quoting Gaus, 980 F.2d at 566). "For these reasons, '[the court] strictly construe[s] the removal statute against removal jurisdiction.'" Id. (quoting Gaus, 980 F.2d at 566). Although "a plaintiff seeking remand has the burden to prove that an express exception to removal exists[,]" Luther v. Countrywide Home Loans Servicing LP, 533 F.3d 1031, 1034 (9th Cir. 2008), "any doubt about the right of removal requires resolution in favor of remand." Moore-Thomas v. Alaska Airlines, Inc., 553 F.3d 1241, 1244 (9th Cir. 2009).

"Diversity removal requires complete diversity, meaning that each plaintiff must be of a different citizenship from each defendant." Grancare, LLC v. Thrower by and through Mills, 889 F.3d 543, 548 (9th Cir. 2018). There is no dispute that plaintiffs and Lamoureux are all citizens of Alaska. But "[i]n determining whether there is complete diversity, district courts may disregard the citizenship of a non-diverse defendant who has been fraudulently joined." Id. PH&S-Washington contends that Lamoureux has been fraudulently joined.

"There are two ways to establish fraudulent joinder: '(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the

non-diverse party in state court.'" Id. (quoting Hunter v. Philip Morris USA, 582 F.3d 1039, 1044 (9th Cir. 2009)). PH&S-Washington relies on the second way here.

"Fraudulent joinder is established the second way if a defendant shows that an 'individual[] joined in the action cannot be liable on any theory.'" Id. (quoting Ritchey v. Upjohn Drug Co., 139 F.3d 1313, 1318 (9th Cir. 1998)). "But 'if there is a possibility that a state court would find that the complaint states a cause of action against any of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court.'" Id. (quoting Hunter, 582 F.3d at 1046). "A defendant invoking federal court diversity jurisdiction on the basis of fraudulent joinder bears a 'heavy burden' since there is a 'general presumption against [finding] fraudulent joinder.'" Id. (quoting Hunter, 582 F.3d at 1046).

"[T]he test for fraudulent joinder and for failure to state a claim under Rule 12(b)(6) are not equivalent." Id. at 549. "A claim against a defendant may fail under Rule 12(b)(6), but that defendant has not necessarily been fraudulently joined." Id. "[A] federal court must find that a defendant was properly joined and remand the case to state court if there is a 'possibility that a state court would find that the complaint states a cause of action against any of the [non-diverse] defendants.'" Id. (quoting Hunter, 582 F.3d at 1046). "If a plaintiff's complaint can withstand a Rule 12(b)(6) motion with respect to a particular defendant, it necessarily follows that the defendant has not been fraudulently joined." Id. at 550. "But the reverse is not true. If [a plaintiff's complaint] cannot withstand a Rule

12(b)(6) motion, the fraudulent [joinder] inquiry does not end there." Id. "[T]he district court must consider . . . whether a deficiency in the complaint can possibly be cured by granting the plaintiff leave to amend." Id.

PH&S Washington first argues that plaintiffs' claim against Lamoureux cannot withstand a Rule 12(b)(6) motion, and contrary to plaintiffs' contention, the Rule 12(b)(6) standard is not irrelevant to the fraudulent joinder analysis. The court may consider whether plaintiffs have stated a plausible intentional interference with prospective economic advantage claim against Lamoureux. If they have, then "it necessarily follows that" Lamoureux "has not been fraudulently joined." Id. If they have not, then the court must consider whether they could "possibly" cure this deficiency by amending their complaint. Id.

"'To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Zixiang Li v. Kerry, 710 F.3d 995, 999 (9th Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Iqbal, 556 U.S. at 678).

> To establish a claim for tortious interference with a prospective business opportunity, a plaintiff must show: (1) an existing prospective business relationship between it and a third party; (2) defendant's knowledge of the relationship and intent to prevent its fruition; (3) failure of the prospective relationship to culminate in pecuniary benefit to the plaintiff; (4) conduct of the

> defendant interfering with the prospective relationship; (5) damages caused by the defendant; and (6) absence of privilege or justification for the defendant's conduct.

K & K Recycling, Inc. v. Alaska Gold Co., 80 P.3d 702, 717 (Alaska 2003). PH&S-Washington does not dispute that plaintiffs have plausibly alleged that they had a prospective business relationship with PAMC, that Lamoureux knew about their prospective business relationship with PAMC, that their prospective business relationship with PAMC did not culminate in pecuniary benefit to them, and that they suffered damages. PH&S-Washington does, however, dispute that plaintiffs have plausibly alleged that Lamoureux interfered with plaintiffs' prospective business relationship with PAMC and that they have plausibly alleged that Lamoureux's interference was not privileged or justified.

As to Lamoureux's interference, plaintiffs argue that they have alleged that Lamoureux interfered with their prospective business relationship with PAMC in the form of the May 22, 2017 letter. But, the May 22, 2017 letter did not interfere with plaintiffs' prospective business relationship with PAMC, primarily because Lamoureux did not actually terminate plaintiffs' privileges in the May 22, 2017 letter. Rather, plaintiffs allege that it was not until June 2018, almost one year later, that PAMC informed them that their privileges would be terminated as of September 4, 2018.[22]

Plaintiffs argue that it is of no import that it was not Lamoureux who terminated their staff privileges. This is so, according to plaintiffs, because in the May 22, 2017 letter

---

[22]Amended Complaint at 6, ¶¶ 31-33, Exhibit A, Notice of Removal, Docket No. 10.

Lamoureux stated that their privileges would be terminated if they did not enter into an agreement with Starr-Wood, and that is exactly what happened when they declined to enter into such an agreement.

But all Lamoureux did in the May 22, 2017 letter was express his disappointment that plaintiffs were unable to "reach mutually-acceptable terms and conditions for provision of cardiothoracic professional services" at PAMC with Starr-Wood and explain that if PAMC were to reach an agreement with Starr-Wood "only surgeons affiliated with" Starr-Wood or an affiliated entity would "have related privileges at PAMC."[23] The May 22, 2017 letter could not plausibly be viewed as interfering conduct because the PAMC Medical Staff Credentials Policy provides that PAMC "may enter into contracts or arrangements with practitioners and/or groups of practitioners for the performance of clinical and administrative services at" PAMC.[24] The Policy further provides that if such a "contract or arrangement confers the exclusive right to perform specified services to one or more practitioners or groups of practitioners" then "no other practitioner except those authorized by or pursuant to the contract or arrangement may exercise clinical privileges to perform the specified services while the contract . . . is in effect."[25] In the May 22, 2017 letter, Lamoureux was

---

[23]May 22, 2017 Letter, Exhibit A, Plaintiffs' Second Motion to Remand, Docket No. 13.

[24]Exhibit B at 24, Declaration of Sheri Kelly in Support of Motion to Dismiss, Docket No. 10.

[25]Id.

merely reminding plaintiffs of these provisions, to which they may have been subject as members of the medical staff.[26]

But even if plaintiffs have plausibly alleged that Lamoureux interfered with their prospective business relationship with PAMC, which they have not, plaintiffs still have not stated a plausible intentional interference claim against Lamoureux because his alleged interference was privileged or justified. "[T]he essential question in determining if interference is justified is whether the person's conduct is motivated by a desire to protect his economic interest, or whether it is motivated by spite, malice, or some other improper objective.'" Kinzel v. Discovery Drilling, Inc., 93 P.3d 427, 444 (Alaska 2004) (quoting RAN Corp. v. Hudesman, 823 P.2d 646, 649 (Alaska 1991)). An agent is "privileged to interfere . . . only if [he] acted to protect [the principal's] best interests." Geolar, Inc. v. Gilbert/Common-wealth Inc. of Mich, 874 P.2d 937, 941 (Alaska 1994); see also, St. Joseph's Regional Health Center v. Munos, 934 S.W.2d 192, 196 (Ark. 1996) ("[i]t is well settled that a party to a contract, and its agents acting in the scope of their authority, cannot be held liable for interfering with the party's own contract").

Plaintiffs have not alleged that Lamoureux was acting outside the scope of his employment. Rather, plaintiffs allege that Lamoureux was "the Alaska Regional Chief

---

[26]Plaintiffs allege that they were not subject to these provisions of the Credentials Policy because these provisions were added to the policy after they obtained their medical privileges at PAMC. Amended Complaint at 4, ¶¶ 19-20, Exhibit A, Notice of Removal, Docket No. 1. However, the Medical Staff bylaws provide for amendment of the Credentials Policy. Medical Staff Bylaws at § 8.B, Exhibit A at 30, Kelly Declaration, Docket No. 10.

Executive of" PH&S-Washington[27] and that he wrote the May 22, 2017 letter, in which he indicated that "he was disappointed to learn that Drs. Valdes and Curtis had not been able to reach mutually acceptable terms under which they would join Starr-Wood" and reminded them that only surgeons affiliated with Starr-Wood would have privileges if PAMC signed a contract with Starr-Wood.[28] These allegations, coupled with the fact that the May 22, 2017 letter was written on PAMC letterhead, establish that Lamoureux was acting within the scope of his employment, that he was acting on behalf of PAMC. It would not be reasonable to infer from plaintiffs' allegations and the May 22, 2017 letter that Lamoureux was acting outside the scope of his employment. The only reasonable inference that can be drawn is that Lamoureux was working to protect PAMC's interests, which would mean that his conduct was privileged or justified.

Plaintiffs, however, argue that it is of no import that Lamoureux may have been acting within the scope of his employment because under Alaska law, in some instances "the breach of contract is also a tort. . . ." Restatement (Second) of Contracts § 355 (1981). Plaintiffs argue that this means that Lamoureux could be held liable for intentional interference even though he was working at PAMC when the interference took place. But, this argument makes no sense because plaintiffs have not alleged a breach of contract claim against Lamoureux

---

[27]Amended Complaint at 2, ¶ 5, Exhibit A, Notice of Removal, Docket No. 10.

[28]Id. at 5-6, ¶ 30.

nor do they explain how the alleged breach of contract claim they assert against PH&S-Washington could give rise to separate tort liability for Lamoureux.

Plaintiffs next argue that a court could infer that Lamoureux had an improper motive because he was pressuring plaintiffs to sign an agreement with Starr-Wood, an agreement which plaintiffs allege would have violated antitrust laws. They argue that it is plausible that Lamoureux was working to strengthen the competitive position of Starr-Wood, PAMC's exclusive contractor, and thus exert more control over cardiothoracic surgery in the Anchorage hospital market. But, it would not be reasonable to infer that Lamoureux was working on Starr-Wood's behalf. There are no allegations in plaintiffs' amended complaint to support such an inference.

Plaintiffs also seem to be suggesting that because Lamoureux had no direct financial interest in their prospective business relationship with PAMC, it is plausible that he was acting for an improper purpose. See RAN Corp., 823 P.2d at 648 ("where an actor has a direct financial interest, he is privileged to interfere with a contract for economic reasons, but not where he is motivated by spite, malice, or some other improper objective"). But, this argument misses the mark because while a direct financial interest will give rise to a privilege, an agent need not have a personal economic interest in order for the agent's conduct on behalf of the principal to be privileged.

Plaintiffs' intentional interference claim also seems to be based on allegations that Lamoureux interfered with their prospective business relationship with future patients. But

such a claim is not plausible because as discussed above, the May 22, 2017 letter cannot be viewed as conduct that would constitute interference and this is the only conduct plaintiffs allege by Lamoureux.

Plaintiffs have not stated a plausible claim for intentional interference with prospective economic advantage against Lamoureux. This claim would not withstand a Rule 12(b)(6) motion to dismiss. But, does not necessarily mean that Lamoureux has been fraudulently joined. The court must consider whether plaintiffs could amend their complaint to state such a claim against Lamoureux. If there is any possibility that they could, then Lamoureux has not been fraudulently joined. But, if the deficiency cannot "possibly be cured", then Lamoureux has been fraudulently joined. Grancare, 889 F.3d at 550.

There is no possibility that plaintiffs could amend their complaint to state a viable claim against Lamoureux. In order to state a viable intentional interference with prospective economic advantage claim against Lamoureux, plaintiffs would have to plead that Lamoureux did something other than write the May 22, 2017 letter. If plaintiffs were aware of other conduct by Lamoureux that could constitute interference, then surely they would have included it in their amended state court complaint or argued in the instant motion that they had additional factual support for their claim against Lamoureux. Similarly, if they had facts to support an allegation that Lamoureux was acting with an improper objective or that he was acting for some entity other than PAMC, surely they would have included those facts in their amended state court complaint or argued in the instant motion that they had

additional factual support for their claim against Lamoureux. It is not sufficient for plaintiffs to argue that there is a possibility that they could amend their complaint to state a plausible intentional interference claim against Lamoureux or that it is possible that a state court might find they could state such a claim against Lamoureux. If a plaintiff could simply assert that it is possible that he might be able to state a viable claim against a non-diverse defendant, no defendant would ever be found to be fraudulently joined. There must be some basis for finding that there is a possibility that plaintiffs could amend their complaint to state a viable claim against Lamoureux. Here, there is no such basis. Thus, Lamoureux has been fraudulently joined and his citizenship may be disregarded for purposes of determining whether the court has diversity jurisdiction.

Plaintiffs next argue that this matter should be remanded because PH&S-Washington is a citizen of Alaska. "For purposes of determining diversity jurisdiction, 'a corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business.'" 3123 SMB LLC v. Horn, 880 F.3d 461, 462–63 (9th Cir. 2018) (quoting 28 U.S.C. § 1332(c)(1)). Plaintiffs allege that PH&S-Washington's "principal place of business is Anchorage, Alaska."[29] PH&S-Washington, however, argues that its principal place of business is in Washington.

"[T]he Supreme Court has defined 'principal place of business' to mean 'the place

---

[29]Amended Complaint at 2, ¶ 4, Exhibit A, Notice of Removal, Docket No. 1.

where the corporation's high level officers direct, control, and coordinate the corporation's activities.'" Id. at 463 (quoting <u>Hertz Corp. v. Friend</u>, 559 U.S. 77, 80 (2010)).

> Under th[is] "nerve center" test, a corporation's principal place of business "should normally be the place where the corporation maintains its headquarters – provided that the headquarters is the actual center of direction, control, and coordination . . . and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)."

<u>Id.</u> at 465 (quoting <u>Hertz</u>, 559 U.S. at 93).

PH&S-Washington offers the declaration of John D. Whipple, who is Deputy General Counsel for PH&S-Washington,[30] in support of its contention that its nerve center is in Washington. Whipple avers that PH&S-Washington's "principal place of business [is] located at 1801 Lind Avenue, SW, Renton, Washington."[31] Whipple avers that PH&S-Washington's

> leadership provide[s] direction, control and coordination of corporate activities, including activities for Providence Alaska Medical Center. The officers of PH&S-WA, including President Mike Butler, Treasurer Venkat Bhamidipati, Assistant Treasurer Jo Ann Escasa-Haigh, and Chief Legal Officer Cindy Strauss, are based in Renton, Washington. PH&S-WA's legal and financial, and administrative offices, which are responsible for, among other things, human resources, management, and communications, are located in Washington.[32]

---

[30]Whipple Declaration at 1, ¶ 1, Exhibit C, Notice of Removal, Docket No. 1.

[31]<u>Id.</u> at 2, ¶ 4.

[32]<u>Id.</u> at 3, ¶ 5.

Plaintiffs argue that Whipple's averments are conclusory and thus are insufficient to establish that PH&S-Washington's nerve center is in Washington. Plaintiffs argue that Whipple has provided no details as to how decisions are made, what role is played by the management structure in Alaska, or the level of control that the Washington officers have as to functions in Alaska.

Whipple's declaration is sufficient to establish that PH&S-Washington's nerve center is in Washington. Whipple's declaration establishes that PH&S-Washington's corporate headquarters are in Renton, Washington; that its corporate leadership is in Washington; and that its legal, financial, and administrative offices are in Washington. And, Whipple's declaration establishes that PH&S-Washington's operations in Washington are substantially greater than its operations in Alaska, in that it owns and operates eight hospitals in Washington, as opposed to two in Alaska.[33] Because its nerve center is in Washington, PH&S-Washington cannot be a citizen of Alaska.

Conclusion

Based on the foregoing, plaintiffs' motion to remand is denied.[34]

DATED at Anchorage, Alaska, this 12th day of February, 2019.

/s/ H. Russel Holland
United States District Judge

---

[33]Id. at 3-4, ¶¶ 6, 9.

[34]Because the motion to remand is denied, the court need not consider plaintiffs' request for fees and costs pursuant to 28 U.S.C. § 1447(c).