IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

WILLIAM CURTIS, M.D., and PEDRO            )
VALDES, M.D.,                              )
                                           )
                          Plaintiffs,      )
                                           )
          vs.                              )
                                           )
PROVIDENCE HEALTH & SERVICES,              )
PROVIDENCE HEALTH & SERVICES-              )
WASHINGTON, and BRUCE LAMOUREUX, )
                                           )        No. 3:18-cv-0281-HRH
                          Defendants.      )
_____ )

## O R D E R

### Motion to Dismiss

Defendants move to dismiss plaintiffs' amended complaint.[1]  This motion is opposed.[2]

Oral argument was not requested and is not deemed necessary.

### Background

Plaintiffs are William Curtis, M.D., and Pedro Valdes, M.D.  Defendants are

Providence Health & Services (PH&S), Providence Health & Services - Washington (PH&S-

Washington), and Bruce Lamoureux.

_____

[1]Docket No. 9.

[2]Docket No. 15.

Plaintiffs are cardiothoracic surgeons who had medical staff privileges at Providence Alaska Medical Center (PAMC).[3]  Plaintiffs allege that "Dr. Valdes was granted medical staff privileges at PAMC in 1995" and that "Dr. Curtis was granted medical staff privileges at PAMC in 2008."[4]

Plaintiffs allege that PAMC is owned and operated by PH&S-Washington and that PH&S is PH&S-Washington's "principal or sole 'member.'"[5]  Plaintiffs allege that PAMC "is the largest acute care hospital in Anchorage and that Alaska Regional Hospital (ARH) "is PAMC's only hospital competitor within the Municipality of Anchorage."[6]

Plaintiffs allege that in August 2016, PAMC completed a review of its cardiothoracic program, which revealed some coverage issues due to the small number of cardiothoracic surgeons with privileges at PAMC.[7]  Plaintiffs allege that PAMC's chief executive, Dr. Mandsager, issued a memo after the review was complete, in which he stated that "for 30 days in 2016, PAMC had no CT EMTALA coverage due to 'an insufficient number of surgeons in Anchorage'" and he expressed that PAMC had "a desire to enter into an

---

[3]Amended Complaint at 3, ¶¶ 13-14, 16, Exhibit A, Notice of Removal of Civil Action, Docket No. 1.

[4]Id. at 3, ¶¶ 13-14.

[5]Id. at 2, ¶ 7.  "PH&S is a holding company. . . ."  Declaration of John D. Whipple [etc.] at 2, ¶ 3, Exhibit C at 2, Notice of Removal of Civil Action, Docket No. 1.

[6]Amended Complaint at 2, ¶ 7, Exhibit A, Notice of Removal of Civil Action, Docket No. 1.

[7]Id. at 4-5, ¶¶ 23-25.

exclusive contract with a single CT group to improve PAMC's CT surgery service efficiency, as well as 'CT surgeon availability, patient outcomes, and patient, staff, and referring physician satisfaction.'"[8]   Plaintiffs allege that in response, they proposed hiring a third cardiothoracic surgeon "if PAMC would guarantee a salary for the third surgeon, making up any shortfall in revenue between collections and $1.5 million, if such a shortfall occurred."[9] Plaintiffs allege that "PAMC did not respond to [their] proposal."[10]

Instead, plaintiffs allege that PAMC was pursuing an exclusive contract with Starr-Wood Cardiac Group of Portland, P.C.[11] Plaintiffs allege that "Starr-Wood sought to affiliate with [them], but the arrangement proposed by Starr-Wood would have made them subordinate to Starr-Wood and given Starr-Wood the power to exclude them from PAMC at any time."[12]   Plaintiffs allege that they "rejected Starr-Wood's proposal."[13]

Plaintiffs allege that on May 22, 2017,

> Lamoureux wrote that he was disappointed to learn that [they] had not been able to reach mutually acceptable terms under which they would join with Starr-Wood. The letter stated: "[s]hould PAMC's negotiations with Starr-Wood or a Starr-

---

[8]Id. at 4-5, ¶¶ 24-25.

[9]Id. at 5, ¶ 26.

[10]Id.

[11]Id. at 5, ¶ 27.

[12]Id. at 5, ¶ 29.

[13]Id.

Wood-affiliated entity end successfully, only surgeons affiliated with the contracting entity will have related privileges at PAMC."[14]

Plaintiffs allege that

> [o]n June 1, 2018, PAMC wrote to [them] that PAMC had entered into an exclusive agreement for CT services and notified them that their clinical privileges to perform cardiac and thoracic surgery services at [PAMC] would automatically terminate on the 'CT Start Date' unless they became employees of NorthStar Cardiothoracic Surgery, LLC, Starr-Wood's contracting subsidiary.[[15]]

Plaintiffs allege that PAMC later informed them that their privileges would terminate on September 4, 2018.[16]

Plaintiffs commenced this action on September 4, 2018. In their original complaint, plaintiffs only asserted claims against PH&S. On October 4, 2018, PH&S-Washington removed the matter to this court.[17] Plaintiffs moved to remand, and on November 8, 2018, this court granted plaintiffs' motion to remand because the case had been improperly removed by a nonparty.[18] Upon remand, plaintiffs filed an amended complaint. In their amended complaint, plaintiffs assert antitrust claims against PH&S, a breach of contract

---

[14]Id. at 5-6, ¶ 30.

[15]Id. at 6, ¶ 31.

[16]Id. at 6, ¶ 32.

[17]Exhibit B at 18, Notice of Removal of Civil Action, Docket No. 1.

[18]Order re Motion to Remand at 6, Docket No. 16, Case No. 3:18-cv-0233-HRH.

claim against PH&S-Washington, a breach of the implied covenant of good faith and fair dealing claim against PH&S-Washington, a breach of the Alaska Unfair Trade Practices Act (UTPA) claim against PH&S-Washington, an intentional interference with prospective economic advantage claim against PH&S-Washington and Lamoureux, and a piercing the corporate veil claim.

Pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, defendants now move to dismiss all of plaintiffs' claims.

<u>Discussion</u>

'To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" <u>Zixiang Li v. Kerry</u>, 710 F.3d 995, 999 (9th Cir. 2013) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 678). "The plausibility standard requires more than the sheer possibility or conceivability that a defendant has acted unlawfully." <u>Id.</u> "'Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 678). "[T]he complaint must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" <u>In re Rigel Pharmaceuticals, Inc. Securities Litig.</u>, 697 F.3d 869, 875

(9th Cir. 2012) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). "In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." <u>Adams v. U.S. Forest Srvc.</u>, 671 F.3d 1138, 1142-43 (9th Cir. 2012). "However, the trial court does not have to accept as true conclusory allegations in a complaint or legal claims asserted in the form of factual allegations." <u>In re Tracht Gut, LLC</u>, 836 F.3d 1146, 1150 (9th Cir. 2016).

Defendants first move to dismiss plaintiffs' antitrust claims. Plaintiffs assert antitrust claims under AS 45.50.562 and AS 45.50.564.[19] "To establish a prima facie case of unreasonable restraint of trade under AS 45.50.562, [plaintiffs] must set forth facts which if proven would establish that 'the defendants combined or conspired with an intent to unreasonably restrain trade.'" <u>Odom v. Fairbanks Memorial Hosp.</u>, 999 P.2d 123, 129 (Alaska 2000) (quoting <u>Smith v. N. Mich. Hosps., Inc.</u>, 703 F.2d 942, 949 (6th Cir. 1983)). "Whether actions are tantamount to unreasonably restraining trade is determined by either the rule of reason test or the per se analysis." <u>Id.</u> Plaintiffs allege that PAMC's "exclusive contract with Starr-Wood does not pass the rule of reason test. . . ."[20] "To establish unreasonable restraint of trade under the rule of reason test, [plaintiffs] must prove three

_____

[19]Plaintiffs' antitrust claims appear to be asserted against PH&S as plaintiffs expressly allege that PH&S "has breached both [antitrust] statutes." Amended Complaint at 10, ¶ 55, Exhibit A, Notice of Removal of Civil Action, Docket No. 1.

[20]<u>Id.</u> at 10, ¶ 57.

elements: '(1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually injures competition.'" Id. (quoting Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1445 (9th Cir. 1988)). "Claims brought under AS 45.50.562 are also referred to as Sherman Act § 1 claims[.]" Id. at 128.

AS 45.50.564 provides that "[i]t is unlawful for a person to monopolize, or attempt to monopolize, or combine or conspire with another person to monopolize any part of trade or commerce." Plaintiffs allege that PAMC attempted to monopolize the Anchorage hospital market.[21] "[T]o state a claim for attempted monopolization, the plaintiff must allege facts that, if true, will prove: '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'"[22] Coalition for ICANN Transparency, Inc. v. VeriSign, Inc., 611 F.3d 495, 506 (9th Cir. 2010) (quoting Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 893 (9th Cir. 2008)). "[C]laims under AS 45.50.564 have been termed Sherman Act § 2 claims." Odom, 999 P.2d at 128.

Defendants first argue that plaintiffs have failed to state plausible antitrust claims because plaintiffs have failed to identify and define the relevant market. See Tanaka v. Univ.

---

[21]Id. at 2-3, ¶¶ 7-12; 10, ¶ 55.

[22]"'The legislature intended that Alaska courts would look to Sherman Act cases in construing the [antitrust] Act.'" Odom, 999 P.2d at 128 (quoting West v. Whitney–Fidalgo Seafoods, Inc., 628 P.2d 10, 14 (Alaska 1981)).

of S. Calif., 252 F.3d 1059, 1063 (9th Cir. 2001) (citation omitted) ("[t]he plaintiff bears the

initial burden of showing that the restraint produces significant anticompetitive effects within

a relevant market"); Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1104

(9th Cir. 1999) ("[m]onopolization claims can only be evaluated with reference to properly

defined geographic and product markets").  The term "relevant market"

> "encompasses notions of geography as well as product use,
> quality, and description.  The geographic market extends to the
> area of effective competition . . . where buyers can turn for
> alternative sources of supply.  The product market includes the
> pool of goods or services that enjoy reasonable interchange-
> ability of use and cross-elasticity of demand."

Tanaka, 252 F.3d at 1063 (quoting Oltz, 861 F.2d at 1446).  "Plaintiffs must identify the

relevant geographic and product markets in which [p]laintiffs and [d]efendants compete and

allege facts demonstrating that [d]efendants' conduct has an anticompetitive effect on those

markets."  Big Bear Lodging Ass'n, 182 F.3d at 1104–05.  "Failure to identify a relevant

market is a proper ground for dismissing a Sherman Act claim."  Tanaka, 252 F.3d at 1063.

Plaintiffs allege that the relevant market is the hospital market in Anchorage.[23]

Defendants argue that this allegation is insufficient for two reasons.  First, defendants argue

that the "hospital market" is not relevant to plaintiffs' antitrust claims because plaintiffs do

not participate in that market.  Defendants argue that antitrust plaintiffs must participate in

the same market as the defendant, that they must be either a consumer or competitor of the

---

[23]Amended Complaint at 2-3, ¶¶ 7-12, Exhibit A, Notice of Removal of Civil Action,
Docket No. 1.

defendant. Because plaintiffs are not hospitals or patients, defendants argue that plaintiffs

could not plausibly participate in the relevant market they have defined. Defendants cite to

Associated General Contractors of California, Inc. v. California State Council of Carpenters,

459 U.S. 519 (1983), in support. But, as the Ninth Circuit has explained,

> [t]he Supreme Court has never imposed a "consumer or competitor" test but has instead held the antitrust laws are not so limited. The Supreme Court's only suggestion of such a restriction is a passing comment in Associated General that the plaintiff union was "neither a consumer nor a competitor" in the relevant market. The Court did not find that fact in any way dispositive, however, and concluded the antitrust injury of unions required case-by-case consideration.

Amer. Ad Mgmt., Inc. v. General Telephone Co. of Calif., 190 F.3d 1051, 1057 (9th Cir.

1999) (quoting Associated General, 459 U.S. at 539). Plaintiffs do not have to be consumers

or competitors of PAMC in order for their antitrust claims to be plausible.

Defendants also argue that plaintiffs' relevant market allegation is insufficient because

plaintiffs have failed to allege any facts to explain why the Municipality of Anchorage is the

appropriate geographic scope of the market. Defendants contend that plaintiffs have not

explained why hospitals outside of the Anchorage-area do not enjoy cross-elasticity of

demand with PAMC and ARH for certain services, such as CT surgery.

But, "'the failure to pinpoint precisely the relevant market through detailed market

analysis is not uniformly fatal to'" antitrust claims. Sisters of Providence in Wash. v. A.A.

Pain Clinic, Inc., 81 P.3d 989, 1001 (Alaska 2003) (quoting Oltz, 861 F.2d at 1448).

Plaintiffs' allegations as to the geographic scope of the relevant market are sufficient to survive a Rule 12(b)(6) motion.

Defendants next argue that plaintiffs have failed to state plausible antitrust claims because it is implausible that PAMC's exclusive contract with Starr-Wood caused any anticompetitive effects within the relevant market. Defendants argue that it is not plausible that an exclusive contract for the provision of physicians for a small subset of surgical services would have any anticompetitive effect. Defendants argue that plaintiffs have not even alleged any connection between PAMC's contract with Starr-Wood and the relevant market.

"Anticompetitive effects include increased prices, reduced output, and reduced quality." West Penn Allegheny Health System, Inc. v. UPMC, 627 F.3d 85, 100 (3rd Cir. 2010). Plaintiffs have adequately alleged anticompetitive effects by claiming that the quality of CT surgery that will be available to consumers at PAMC has been reduced as a result of the exclusive contract with Starr-Wood.[24]

But even if plaintiffs' anticompetitive effects allegations are adequate, defendants argue that plaintiffs' antitrust claims should still be dismissed because plaintiffs lack standing to bring these claims. "Antitrust standing is distinct from Article III standing: 'A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party

---

[24]Amended Complaint at 7-8, ¶¶ 42-45; 9, ¶ 52, Exhibit A, Notice of Removal of Civil Action, Docket No. 1.

to bring a private antitrust action.'" <u>Dang v. San Francisco Forty Niners</u>, 964 F. Supp. 2d 1097, 1110 (N.D. Cal. 2013) (quoting <u>Am. Ad Mgmt.</u>, 190 F.3d at 1054 n.3). "To have standing as an antitrust plaintiff, a party must demonstrate antitrust injury, meaning it must show 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" <u>Int'l Longshore and Warehouse Union v. ICTSI Oregon, Inc.</u>, 863 F.3d 1178, 1186 (9th Cir. 2017) (quoting <u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 334 (1990)). "Antitrust laws are designed to protect competition, not competitors." <u>Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.</u>, 141 F.3d 947, 951 (9th Cir. 1998). "'[T]he alleged injury must be caused by a reduction, rather than an increase, in competition resulting from the restraint.'" <u>Id.</u> (quoting <u>Theee Movies of Tarzana v. Pacific Theatres, Inc.</u>, 828 F.2d 1395, 1400 (9th Cir. 1987)). "[A] plaintiff must show proof of actual harm to competition reaching beyond mere harm to itself as a competitor." <u>Sisters of Providence</u>, 81 P.3d at 1003.

Plaintiffs have alleged harm "beyond mere harm" to themselves. <u>Id.</u> Plaintiffs have alleged "decreased consumer welfare[.]" <u>Id.</u> Specifically, plaintiffs have alleged that because Starr-Wood's surgeons do not live in Alaska, the Starr-Wood surgeons will not be able to follow up with their patients, that there may be a lack of surgeons available, and that some of the Starr-Wood surgeons are relatively inexperienced.[25] In <u>Sisters of Providence</u>,

---

[25]Amended Complaint at 7-8, ¶¶ 42-45, Exhibit A, Notice of Removal of Civil Action, Docket No. 1.

the court found evidence of such issues to be relevant to the "harm to competition" question.

Id.  But that does not mean that plaintiffs have standing to bring their antitrust claims.

Plaintiffs are alleging that PAMC patients will be harmed by the exclusive contract

with Starr-Wood.  "A plaintiff who complains of an injury . . . that is derivative of an injury

suffered by a third party absent from the suit is generally unable to establish antitrust

standing."  Toscano v. PGA Tour, Inc., 201 F. Supp. 2d 1106, 1116–17 (E.D. Cal. 2002).

"Standing . . . examines the connection between the asserted wrongdoing and the claimed

injury to limit the class of potential plaintiffs to those who are in the best position to vindicate

the antitrust infraction."  Greater Rockford Energy and Tech. Corp. v. Shell Oil Co., 998 F.2d

391, 395 (7th Cir. 1993).

> [T]he nature of plaintiff's injury, the directness or indirectness
> of the asserted injury, the potential for duplicative recovery or
> complex apportionment of damages, the speculative nature of
> damages asserted, and the existence of more direct victims of
> the alleged violation are factors a court must consider when
> making the "proper party" determination.

Exhibitors' Service, Inc. v. American Multi-Cinema, Inc., 788 F.2d 574, 578 (9th Cir. 1986).

Consideration of these factors leads to the conclusion that plaintiffs are not the proper parties

to enforce the harm to patients that has allegedly been caused by PAMC's anticompetitive

conduct.  There are more direct victims of the alleged violations and the alleged harm to

PAMC's patients is speculative, at best, as this point.  Because plaintiffs are not the proper

parties to bring the antitrust claims they are asserting, plaintiffs lack standing to bring their

antitrust claims and these claims are dismissed.

Defendants next move to dismiss plaintiffs' breach of contract claim. "A breach of contract claim depends on proof of the existence of a contract, breach, and damages." Brooks Range Petroleum Corp. v. Shearer, 425 P.3d 65, 79 (Alaska 2018). Plaintiffs allege that PH&S-Washington "breached its own bylaws" by "rescinding their medical staff privileges without cause and by excluding them from the hospital facilities where they may perform cardiac and thoracic surgery."[26] Plaintiffs allege that

> [t]he bylaws have a mechanism for suspension or revocation of medical staff privileges, but the procedure focuses on medical competence, safety and patient care, violation of ethical standards, and disruptive behavior. The bylaws are silent as to limitations on, or termination of, medical staff privileges for economic or administrative decisions made by the hospital.[27]

Defendants argue that plaintiffs' breach of contract claim is not plausible because PH&S-Washington could not have possibly breached the provision in the bylaws to which plaintiffs refer because it is undisputed that plaintiffs were terminated for administrative reasons. If, as plaintiffs allege, the bylaws are silent as to termination of privileges for administrative reasons, defendants argue that plaintiffs have no plausible breach of contract claim.

Plaintiffs are alleging that PH&S-Washington terminated their staff privileges for an impermissible reason. The bylaws set out the reasons why privileges may be terminated. If

---

[26]Amended Complaint at 10, ¶¶ 61-62, Exhibit A, Notice of Removal of Civil Action, Docket No. 1.

[27]Id. at 4, ¶ 22.

these are the only reasons that plaintiffs' privileges could be terminated, then it is plausible

that PH&S-Washington breached the bylaws.

Defendants, however, argue that the foregoing reasons were not the only permissible

reasons for terminating plaintiffs' privileges.  As plaintiffs allege, PAMC's Medical Staff

Credentials Policy expressly provides that

> "[f]rom time to time, the Medical Center may enter into con-
> tracts or arrangements with practitioners and/or groups of
> practitioners for the performance of clinical and administrative
> services at the Medical Center.
>
> * * *
>
> To the extent . . . any such contract or arrangement confers the
> exclusive right to perform specified services to . . . groups . . .
> no other practitioner except those authorized by or pursuant to
> the contract or arrangement may exercise clinical privileges to
> perform the specified services while the contract or resolution
> is in effect."[28]

Defendants argue that this provision gave PAMC the right to enter into an exclusive contract

with Starr-Wood and to terminate plaintiffs' privileges as a result.  Thus, defendants insist

that plaintiffs' breach of contract claim is implausible.

But, as plaintiffs point out, they have alleged that the exclusive contract provision

"does not form a part of their agreement with PAMC" because it was "adopted after [they]

obtained medical staff privileges at PAMC[.]"[29]  Whether plaintiffs' contracts with PAMC

---

[28]Id. at 3, ¶ 18 (quoting Medical Staff Credentials Policy, § 4.E(a)-(b)).

[29]Id. at 4, ¶ 20.

have been modified may be a question of law, <u>Weiner v. Burr, Pease & Kurtz, P.C.</u>, 221 P.3d 1, 7 (Alaska 2009), but it is not a question that the court can resolve with what is currently before it. Because it is possible that the exclusive contract provision was not part of plaintiffs' contracts, plaintiffs' breach of contract claim is plausible.

Defendants next move to dismiss plaintiffs' breach of the implied covenant of good faith and fair dealing claim. "The covenant of good faith and fair dealing is implied in every contract in order to effectuate the reasonable expectations of the parties to the agreement, not to alter those expectations." <u>Ramsey v. City of Sand Point</u>, 936 P.2d 126, 133 (Alaska 1997). "The covenant of good faith cannot be interpreted to prohibit what is expressly permitted by [plaintiffs'] contract with [PH&S-Washington]." <u>Id.</u> Defendants argue that plaintiffs' breach of the implied covenant claim is implausible because the covenant cannot be interpreted to prohibit PH&S-Washington's express contractual rights to terminate plaintiffs' privileges because it entered into an exclusive contract with another provider. In short, defendants argue that if plaintiffs' breach of contract claim is implausible, then so is their breach of the implied covenant claim.

But, as discussed above, plaintiffs' breach of contract claim is plausible. Therefore, plaintiffs' breach of the implied covenant of good faith and fair dealing claim survives defendants' Rule 12(b)(6) motion to dismiss as well.

Defendants next move to dismiss plaintiffs' UTPA claims. The Alaska UTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the

conduct of trade or commerce. . . ."  AS 45.50.471(a).  "Two elements must be proved to establish a prima facie case of unfair or deceptive acts or practices under the Alaska Act: (1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred."  State v. O'Neill Investigations, Inc., 609 P.2d 520, 534 (Alaska 1980).  The court may consider the following factors

> in determining the existence of an unfair practice[:] (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or other-wise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

Kenai Chrysler Center, Inc. v. Denison, 167 P.3d 1240, 1255 (Alaska 2007) (citation omitted).  "[W]hether an act is 'deceptive' is determined simply by asking whether it 'has the capacity or tendency to deceive.'"  Borgen v. A & M Motors, Inc., 273 P.3d 575, 591 (Alaska 2012) (quoting ASRC Energy Servs. Power & Commc'ns LLC v. Golden Valley Elec. Ass'n, Inc., 267 P.3d 1151, 1159-60 (Alaska 2011)).

Plaintiffs allege that PH&S-Washington violated subsection (b)(12) of the UTPA, which prohibits acts

> using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppress-ing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged[.]

AS 45.50.471(b)(12). More specifically, plaintiffs allege that PH&S-Washington violated the UTPA by "stating the exclusive contract was needed to promote patient care, when in fact it was not necessary for patient care and will cause the level of patient care to decline."[30] Plaintiffs allege that this statement was made by PAMC's then chief executive officer, Dr. Mandsager.[31] But, defendants argue that plaintiffs' allegations are insufficient to state a plausible (b)(12) UTPA claim because although plaintiffs allege that Dr. Mandsager's statement was false, they do not allege that he wrote the memo with the "intent that others rely" on it. AS 45.50.471(b)(12).

Plaintiffs argue that "deception is not required, nor is any intent to deceive." South Peninsula Hospital v. Xerox State Healthcare LLC, 223 F. Supp. 3d 929, 940–41 (D. Alaska 2016). Thus, they argue that it does not matter if Dr. Mandsager intended anyone to rely on the memo.

Whether deception or an intent to deceive is required not the issue here. The issue is whether plaintiffs have alleged that Dr. Mandsager intended others to rely on the memo. Subsection (b)(12) of the UTPA expressly requires reliance. Plaintiffs have not alleged any reliance on the memo by anyone. Thus, plaintiffs' (b)(12) UTPA claim is implausible, and it is dismissed.

---

[30]Amended Complaint at 11, ¶ 70, Exhibit A, Notice of Removal of Civil Action, Docket No. 1.

[31]Id. at 4, ¶ 23; 5, ¶ 25.

Plaintiffs also allege that PH&S-Washington violated subsection (b)(14) of the UTPA, which prohibits someone from "representing that an agreement confers or involves rights, remedies, or obligations that it does not confer or involve, or that are prohibited by law[.]" Plaintiffs allege that PH&S-Washington violated subsection (b)(14) "by engaging in an unfair method of competition, using its dominant position in the Anchorage hospital market to promote some cardiothoracic surgeons over others on a false claim of necessity."[32]

Plaintiffs have not stated a plausible b(14) UTPA claim. They are alleging that the contract at issue is the Starr-Wood contract, but they have not alleged that PAMC represented that the Starr-Wood contact conferred rights, remedies, or obligations that it did not confer. Rather, they allege that the reason PAMC gave for entering into the Starr-Wood contract was false, but that is a different matter. Plaintiffs' b(14) UTPA claim is implausible, and it is dismissed.

Defendants next move to dismiss plaintiffs' intentional interference with a prospective business relationship claims.

> To establish a claim for tortious interference with a prospective business opportunity, a plaintiff must show: (1) an existing prospective business relationship between it and a third party; (2) defendant's knowledge of the relationship and intent to prevent its fruition; (3) failure of the prospective relationship to culminate in pecuniary benefit to the plaintiff; (4) conduct of the defendant interfering with the prospective relationship; (5) damages caused by the defendant; and (6) absence of privilege or justification for the defendant's conduct.

---

[32]Id. at 11, ¶ 71.

K & K Recycling, Inc. v. Alaska Gold Co., 80 P.3d 702, 717 (Alaska 2003). Plaintiffs assert this claim against both PH&S-Washington and Lamoureux. The court has already determined that plaintiffs have failed to state a plausible intentional interference claim against Lamoureux.[33] The only question here is whether plaintiffs have stated a plausible intentional interference claim against PH&S-Washington.

Plaintiffs contend that they are alleging that PH&S-Washington interfered with their prospective business relationship with future patients. Plaintiffs argue that they have alleged that PH&S-Washington interfered with this relationship because plaintiffs have lost their ability to perform surgery at PAMC and thus patients at PAMC no longer have access to plaintiffs. In short, plaintiffs argue that they have alleged that PH&S-Washington has severed their economic relationship with future PAMC patients. Plaintiffs argue that it is irrelevant that they can still treat patients at ARH because they are alleging that they have lost their ability to treat PAMC patients.

Plaintiffs argue that PH&S-Washington was not privileged or justified in interfering with their prospective business relationship with future PAMC patients. "[W]here there is a direct financial interest in a contract, the essential question in determining if interference is justified is whether the person's conduct is motivated by a desire to protect his economic interest, or whether it is motivated by spite, malice, or some other improper objective.'" Kinzel v. Discovery Drilling, Inc., 93 P.3d 427, 444 (Alaska 2004) (quoting RAN Corp. v.

_____

[33]Order re Motion to Remand at 14, Docket No. 22.

Hudesman, 823 P.2d 646, 649 (Alaska 1991)).  Plaintiffs argue that PH&S-Washington does not have any direct interest in their relationship with future patients and that they have alleged that PH&S-Washington had an improper objective.  Plaintiffs argue that it is reasonable to infer that PH&S-Washington was attempting to "drive a wedge between the plaintiffs and their patients, and to use [PAMC's] privileging authority to financially benefit its exclusive contractor[.]"[34]

The problem with plaintiffs' argument is that the patients plaintiffs are alleging they will not be able to have a relationship with are patients who come to PAMC seeking medical treatment; in other words they are PAMC's patients.  PH&S-Washington has a direct financial interest in PAMC's patients and thus any alleged interference by PH&S-Washington would have been justified.  As for plaintiffs' allegations that PH&S-Washington had an improper motive, it is implausible that PH&S-Washington had an improper motive given that the exclusive contract with Starr-Wood would actually undermine PAMC's market share because now plaintiffs would perform all their surgery at ARH, rather than doing some at PAMC.  Plaintiffs' intentional interference claim against PH&S-Washington is not plausible, and this claim is dismissed.

Finally, defendants move to dismiss plaintiffs' piercing the corporate veil claim.  "In general, courts seek to recognize and uphold 'the principles that the corporation exists as a separate legal entity and that owner liability for the debts of the corporation is limited.'"

---

[34]Plaintiffs' Opposition [etc.] at 30, Docket No. 15.

L.D.G., Inc. v. Brown, 211 P.3d 1110, 1125 (Alaska 2009) (quoting Pyramid Printing Co. v. Alaska State Comm'n for Human Rights, 153 P.3d 994, 1000 (Alaska 2007)). "[T]he corporate veil may be pierced when a corporation is nothing more than a 'mere instrument' of a shareholder[.]" Id. (quoting Uchitel Co. v. Telephone Co., 646 P.2d 229, 235 (Alaska 1982)).

> Under this mere instrument test, [the court] ask[s] whether (a) the shareholder sought to be charged owns all or most of the stock of the corporation; (b) the shareholder has subscribed to all of the capital stock of the corporation or otherwise caused its incorporation; (c) the corporation has grossly inadequate capital; (d) the shareholder uses the property of the corporation as his own; (e) the directors or executives of the corporation act independently in the interest of the corporation or simply take their orders from the shareholder in the latter's interest; and (f) the formal legal requirements of the corporation are observed.

Id. at 1125–26.

Plaintiffs allege that PH&S-Washington is a "mere instrument" of PH&S and "[b]y executing the exclusive contract," PH&S acted through PH&S-Washington "to defeat public convenience and justify wrong."[35]  The only factual allegation that plaintiffs make in support of their piercing the corporate veil claim is that PH&S is the sole member of PH&S-Washington, which is not sufficient factual support to make plaintiffs' piercing the corporate veil claim plausible.  Under Alaska law, mere ownership is insufficient evidence to support a conclusion that the owner sought to "defeat public convenience." Uchitel, 646 P.2d at 234.

---

[35]Amended Complaint at 12, ¶¶ 77-78, Exhibit A, Notice of Removal of Civil Action, Docket No. 1.

Plaintiffs point out that in his declaration, which is attached as Exhibit C to the Notice of Removal, John Whipple avers that the board of directors for PH&S and PH&S-Washington are the same and from the exhibits attached to his declaration, it appears that PH&S caused that incorporation of PH&S-Washington.[36] But, Whipple's averments and the exhibits attached to his declaration are not part of plaintiffs' amended complaint. The only allegation in plaintiffs' complaint in support of their piercing the corporation veil claim is that PH&S is the sole member of PH&S-Washington. This is insufficient factual support. Plaintiffs' piercing the corporate veil claim is implausible, and it is dismissed.

## Conclusion

Defendants' motion to dismiss is granted in part and denied in part. The motion is denied as to plaintiffs' breach of contract and breach of the implied covenant of good faith and fair dealing claims. The motion is granted as to plaintiffs' antitrust claims, UTPA claims, intentional interference claims, and piercing the corporate veil claim. Plaintiffs are not given leave to amend their intentional interference claim against Lamoureux because as the court has already determined, any amendment of this claim would be futile.[37] Plaintiffs' intentional interference claim against Lamoureux is dismissed with prejudice. Plaintiffs' intentional interference claim against PH&S-Washington is also dismissed with prejudice as amendment of this claim would be futile. As to plaintiffs' antitrust, UTPA, and piercing the

---

[36]Whipple Declaration at 2, ¶ 2; 3, ¶ 5, and Exhibits 1 and 3 thereto, Exhibit C, Notice of Removal, Docket No. 1.

[37]Order re Motion to Remand at 14-15, Docket No. 22.

corporate veil claims, plaintiffs are given leave to amend these claims.  Although the court is not prepared to say that amendment as to these claims would be futile, it is the court's perception that the possibility of plaintiffs being able to state plausible antitrust,  UTPA, and piercing the corporate veil claims is unlikely.  Should plaintiffs elect to file a second amended complaint, said complaint shall be filed on or before March 26, 2019.

DATED at Anchorage, Alaska, this 5th day of March, 2019.

/s/ H. Russel Holland
United States District Judge